JL

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Steven A. Saenz,

Plaintiff,

v.

Robert Lane, et al.,

Defendants.

No.   CV-22-00047-TUC-JAS

**ORDER**

Plaintiff Steven A. Saenz, who is represented by counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983. Defendants City of South Tucson and Police Officers Robert Lane and John Chavez move for summary judgment on the merits of Plaintiff's Fourth Amendment excessive force and ratification claims and on qualified immunity grounds. (Doc. 161.) The Motion is fully briefed. (Docs. 169, 172.)

Also before the Court are Defendants' First Motion to Compel Discovery (Doc. 153), Plaintiff's Motion to Quash Subpoena Duces Tecum (Doc. 155), and Plaintiff's Response in Opposition to Defendants' Motion to Compel Discovery and Cross-Motion for Award of Fees and Costs and Sanctions (Doc. 156).

The Court will grant the Motion for Summary Judgment in part and deny it in part. The Court will deny Defendants' Motion to Compel Discovery, grant Plaintiff's Motion to Quash Subpoena, and deny Plaintiff's Cross-Motion.

. . . .

. . . .

## I.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

Where the evidence includes video footage, the Court considers the facts in the light depicted by the video but still draws all inferences from the video in Plaintiff's favor. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (a court may properly consider video evidence

in ruling on a motion for summary judgment and should view the facts "in the light depicted by the videotape"); *Williams v. Las Vegas Metro. Police Dep't*, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) ("[t]he existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor") (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir. 2007)).  However, if a party's "version of events is so utterly discredited by the record that no reasonable jury could have believed him," a court should "view[] the facts in the light depicted by the videotape."  *Scott*, 550 U.S. at 380-81.   The Ninth Circuit has stated that although a court views facts "blatantly contradicted" by video footage "in the light depicted by the videotape and its audio," the court "must view all other facts . . . in the light most favorable to [the plaintiff]."  *Hughes v. Rodriguez*, 31 F.4th 1211, 1220 (9th Cir. 2022); *see Scott*, 550 U.S. at 380 ("[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").

**II.     Facts**

   **A.     Undisputed Facts**

On October 12, 2019, at approximately 7:06 p.m., a 911 caller reported to a Tucson Police Department (TPD) call-taker that Leticia Bojorquez and Fernando Gomez-Gonzales were holding hostages inside 218 E. 29th Street for drug money, the suspects were armed with a handgun, the number of hostages was unknown, but the residence was full of people. (Defs.' Statement of Facts (DSOF) ¶¶ 1-5.)  Defendant Lane was dispatched at 7:08:15, and Defendant Chavez was dispatched 10 seconds later.  (Pl.'s Conflicting Statement of Facts (PCSOF) ¶ 46.)  At 7:09:14, the dispatcher reported that the 911 caller was "plotting" within meters of 2910 W. 30th St.[1] and refused to give her name.  (*Id.* ¶ 47.)

---

[1] 2910 W. 30th St. does not exist.  It appears the dispatcher might have meant 2910 S. 6th Ave., which is approximately 8/10 of a mile from 218 E. 29th St., as shown in Plaintiff's Exhibit 46.  (Doc. 168-2 at 106.)

At 7:16 p.m., while Defendants Lane and Chavez were en route, a second 911 call was made from 218 E. 29th Street, apartment D. (DSOF ¶ 8; PCSOF ¶ 48.) The TPD dispatcher noted the following regarding the call:

> H[ispanic]/m[ale]/gry shirt/levis ju[]st choked her daughter; he has a toole (sic) on him and broke down door; adv he is loony; subj is at doorway; daughter is holding her neck; Comp is refused [caller refuses to give name]; subj is on 1801 [drugs]

(Doc. 161-2 at 4.) The second 911 caller was identified as Rebecca Samaniego ("Rebecca"). (DSOF ¶ 8.) The man was later identified as Plaintiff. (*Id.* ¶ 11.) Rebecca's daughter was identified as Plaintiff's girlfriend, Reina Samaniego ("Reina"). (*Id.* ¶ 12.)

Defendant Lane arrived at 218 E. 29th St. at 7:19 p.m., and Defendant Chavez arrived at approximately the same time in a separate patrol car. (*Id.* ¶ 14.) There were bystanders outside yelling. (*Id.* ¶ 15.)

**B.    Defendants' Facts**

Within seconds of arriving at the scene, Lane approached Reina, who was crying and holding her neck. (*Id.* ¶ 16.) Rebecca pointed at a man wearing a gray shirt and Levi's, later identified as Plaintiff, who was walking away from the front door of apartment D, and yelled, "My daughter. He was choking my daughter." (*Id.* ¶ 17.)

Defendant Lane approached Plaintiff and ordered him to stop, turn around and face away from him, but Plaintiff continued to walk away. (*Id.* ¶ 18.) Lane again ordered Plaintiff to stop and turn around. (*Id.* ¶ 19.) Defendant Chavez unholstered his service weapon and ordered Plaintiff to put his hands up. (*Id.* ¶ 20.) Plaintiff lifted up his shirt. (*Id.* ¶ 21.) Lane told Plaintiff that he did not have to take his shirt off and again ordered him to stop. (*Id.*) Plaintiff continued walking toward the street. (*Id.* ¶ 22.)

Plaintiff made his way to the sidewalk one step away from the street and oncoming traffic. (*Id.* ¶ 23.) Defendant Lane discharged his taser. (*Id.*) The taser shot made contact with Plaintiff's left lower back. (*Id.* ¶ 24.) Plaintiff fell to the pavement and began yelling as Defendant Chavez attempted to restrain and handcuff him. (*Id.* ¶ 25.) Plaintiff flailed,

and Chavez discharged pepper spray in Plaintiff's face for approximately one second. (*Id.* ¶ 26.)  Plaintiff tried to get up. (*Id.*)  Lane discharged his taser for a five second probe deployment cycle. (*Id.*)  Chavez attempted to restrain and handcuff Plaintiff when Plaintiff dislodged the taser leads, got up, and started running down the street into traffic. (*Id.* ¶ 29.) Lane chased Plaintiff and ordered him to stop, but Plaintiff did not comply. (*Id.* ¶¶ 30-31.)

Defendant Lane caught up to Plaintiff, and Plaintiff tried to grab Lane's taser. (*Id.* ¶ 32.)  Plaintiff swung his left hand at Lane and struck Lane's body, knocking his body worn camera to the pavement. (*Id.*)  Lane struck Plaintiff with his fist on the left side of Plaintiff's head. (*Id.* ¶ 34.)  Plaintiff "rolled on the pavement" and tried to get up. (*Id.* ¶ 35.)  Lane deployed another contact tase as he was on top of Plaintiff. (*Id.* ¶ 36.)  Plaintiff grabbed the taser, then let go when it shocked his hand. (*Id.*)  Lane tased Plaintiff's upper left shoulder, and Plaintiff again grabbed the taser and tried to take it from Lane. (*Id.* ¶ 37.)  Lane took the taser from Plaintiff's grasp and holstered it. (*Id.* ¶ 38.)

Plaintiff tried to get up, and Defendant Lane placed his feet under his body to prevent Plaintiff from getting up. (*Id.* ¶ 39.)  Lane then radioed for urgent assistance. (*Id.* ¶ 40.)  Lane positioned his body weight on Plaintiff and used his right arm to keep Plaintiff from pushing off the ground with his right arm. (*Id.* ¶ 41.)  Vehicular traffic had to brake to avoid Lane and Plaintiff, and Lane's body worn camera was destroyed by oncoming traffic. (*Id.* ¶ 43.)

At 7:27 p.m., the first back up unit from the Tucson Police Department arrived. (*Id.* ¶ 44.)  Additional TPD units followed, and at 7:28 p.m., Plaintiff was placed in RIPP restraints. (*Id.* ¶ 45.)  It took multiple officers to restrain and detain Plaintiff. (*Id.* ¶ 46.) Plaintiff was carried out of the roadway, and Defendant Lane requested medical assistance for him. (*Id.* ¶ 47.)

Plaintiff was charged with assault and felony assault on law enforcement officers, and subsequently, a grand jury returned an indictment against Plaintiff on charges that included aggravated assault against a peace officer, burglary/forcible entry and "other offenses/other felonies." (*Id.* ¶ 49.)  Plaintiff ultimately pleaded guilty to criminal damage

for damaging the metal safety door of Reina's residence with a metal bar when he broke into it. (*Id.* ¶ 51.)

### C.    Plaintiff's Facts

Plaintiff and Reina had a long relationship, and Plaintiff lived with her in Reina's apartment, 218 E. 29th St, Apartment A, off and on. (PCSOF ¶ 37.) Rebecca Samaniego lived in Apartment B. (*Id.* ¶ 38.) On the evening of October 12, 2019, at around 7:00 p.m., Plaintiff and Reina got into an argument, and "voices were raised." (*Id.* ¶ 40.) During the argument, Reina's brother "showed up at the metal outside door, which was locked, and began shouting at [Plaintiff] and using a piece of rebar to try to get in." (*Id.* ¶ 41.) "This progressed to [Reina's brother] getting access, and assaulting [Plaintiff]." (*Id.*) Rebecca yelled that she was calling the police, and a few moments later, Rebecca yelled that the police were coming. (*Id.* ¶¶ 42-43.) Reina's brother "disappeared," Plaintiff went back inside the apartment, and Rebecca and Reina waited outside. (*Id.* ¶ 44.)

Defendants Lane and Chavez responded to the 911 call reporting that Lettie Bojorquez Fernando Gomez-Gonzalez were holding people hostage at 218 E. 29th St, but the location where the caller was "plotting" was nowhere near Reina's apartment. (*Id.* ¶¶ 45, 47.) Lane arrived at 218 E. 29th St. 13 minutes after the hostage call was received and 11 minutes after being dispatched. (*Id.* ¶ 49.)

When Rebecca saw Defendant Lane's vehicle arrive, she yelled, "The police are here!" (*Id.* ¶ 50.) Plaintiff left the apartment, walked into the parking lot to his right and "arriv[ed] at the rear end of his car which was parked in the lot, just as Lane walked up to him." (*Id.*) Lane "said nothing to [Rebecca and Reina]," who were standing near the sidewalk, separated from them by a car in the lot." (*Id.*) ¶ 52.) Lane asked Plaintiff what was going on, and Plaintiff began to explain what had happened. (*Id.* ¶ 53.) Plaintiff pointed to his left arm, where he had blocked the blows from the rebar. (*Id.*) Defendant Chavez arrived, parked behind Lane's SUV, exited his vehicle, and as he quickly walked up, pulled his handgun from his holster. (*Id.* ¶ 57.) Defendant Lane also drew his weapon and began shouting as well. (*Id.* ¶ 58.)

Plaintiff pulled up his shirt to show the police he was not armed, and he rotated 360 degrees "so they could see." (*Id.* ¶ 60.) Plaintiff "[u]nknowingly" took a few steps toward 29th Street, and "the next moment," Defendant Lane discharged his taser into Plaintiff's body. (*Id.* ¶ 61.) Plaintiff collapsed on the pavement. (*Id.* ¶ 62.) Neither Defendant informed Plaintiff that he was under arrest, and Lane gave no warning before he fired the first cartridge. (*Id.* ¶ 67.)

At that point, Plaintiff was lying on his back, awaiting handcuffing. (*Id.* ¶ 70.) Plaintiff then "reflexively jumped up and began running." (*Id.*) Defendant Lane discharged a second Taser cartridge into Plaintiff. (*Id.* ¶ 71.) At the same moment, Defendant Chavez pulled and discharged his chemical spray, an OC canister, into Plaintiff's face. (*Id.* ¶ 73.) Neither officer gave any warning of the use of these weapons. (*Id.* ¶ 74.) Plaintiff leapt up and tried to flee. (*Id.*)

Defendant Lane pursued Plaintiff, pressing his Taser into Plaintiff's back in drive-stun mode. (*Id.* ¶ 75.) Defendant Lane then struck Plaintiff with his fist to the side of Plaintiff's head. (*Id.*) Lane pressed the Taser against Plaintiff's thigh more than once, and Plaintiff tried to dislodge the Taser. (*Id.*) Holding Plaintiff from behind, Lane took Plaintiff down to the pavement. (*Id.*) Lane and Chavez delivered punches and kicks to Plaintiff's body. (*Id.* ¶ 77.) With the weight of the two officers on top of him, Plaintiff was unable to get a breath, and before the TPD officers arrived, he twice blurted out, "I can't breathe!" (*Id.* ¶ 78.) The body worn camera footage from one of the first TPD officers on the scene shows Lane with his arm around Plaintiff's neck as the officer approaches. (*Id.* ¶ 79.) The body-worn camera footage also shows officers pressing Plaintiff's face into the pavement with both hands, two TPD officers with their knees on his neck, and Lane pressing down on Plaintiff's spine with his full body weight. (*Id.* ¶ 80.) Plaintiff was face-down on the pavement and was not resisting. (*Id.* ¶ 75.) Plaintiff's ankles were secured with a TARP, or RIPP-Hobble, device.[2] (*Id.* ¶¶ 27, 75.)

---

[2] A TARP is a flexible strap used to secure the ankles of a subject. (PCSOF ¶ 27.)

Plaintiff did not attempt to strike Lane or Chavez at any time. (*Id.* ¶ 76.) Plaintiff was "dazed" and not resisting in any way, and he had lost consciousness "[w]ell before" the officers were pressing their knees on his neck and Lane was pressing down on his spine. (*Id.* ¶ 81.)

The TPD officers' body worn camera footage runs for 31 minutes, during which Plaintiff is "dumped on the side of the street, remains trussed up in the Ripp-Hobble, on his side, without anyone removing the hobbles, getting him upright, or providing first aid for the chemical spray." (*Id.* ¶ 82.) Plaintiff suffered injuries to his face and head and had four puncture wounds on his body. (Pl.'s Decl., Doc. 173-3 at 6 ¶¶ 14-15; Doc. 173-3 at 38-43.) The Taser records indicate that Defendant Lane deployed his Taser 22 times in five-second cycles between 7:19 p.m. and 7:23 p.m. (Doc. 161-3 at 2-3.)

### D.    Video Evidence

Defendant Chavez's body-worn camera footage begins at 19:19:53 with Defendant Chavez in his patrol vehicle arriving at the scene. (Exh. A, 19:19:53.) Defendant Lane's patrol vehicle is parked in front of Chavez's patrol vehicle. (*Id.* at 19:20:03.) Chavez approaches Lane, who is speaking to Plaintiff. (*Id.* at 19:20:11.) Chavez turns toward Rebecca Samaniego, who tells Chavez, "My daughter, he was choking my daughter." (*Id.* at 19:20:15.) Chavez walks toward Lane and Plaintiff, and Plaintiff is briefly out of sight of the camera. (*Id.* at 19:20:20.) Plaintiff is seen with his hands partially raised in front of him, and Chavez yells at Plaintiff, "Stop!" (*Id.* at 19:20:21.) Plaintiff starts to take off his shirt, and Chavez yells at Plaintiff, "Stop!" and then "No!" (*Id.* at 19:20:26.) Chavez yells at Plaintiff twice, "Get on the ground!" (*Id.* at 19:20:29.)

Plaintiff takes a few steps on the sidewalk, and Lane yells at him "Get on the ground!" (*Id.* at 19:20:37.) Lane says something unintelligible to Plaintiff and deploys his Taser. (*Id.* at 19:20:39.) Plaintiff screams in pain, stumbles forward, and falls onto the street. (*Id.* at 19:20:40.) An oncoming vehicle is near where Plaintiff falls in the street. (*Id.* at 19:20:42.) Lane and Chavez yell at Plaintiff to get on the ground as Plaintiff continues to scream in pain, and Chavez takes out his handcuffs. (*Id.* at 19:20:47.)

Chavez's hands cover Plaintiff as he appears to struggle on the ground. (*Id.* at 19:20:47-19:20:51.) Plaintiff then gets up and begins running away from the officers. (*Id.* at 19:20:51.)

Defendant Lane catches up to Plaintiff and forcefully pushes him down to the pavement. (*Id.* at 19:20:51-19:20:59.) Lane tases Plaintiff again as Plaintiff cries out in pain. (*Id.* at 19:21:01.) One of the officers tells Plaintiff to stop resisting as Chavez tries to handcuff Plaintiff. (*Id.* at 19:21:04.) Chavez tells Plaintiff to put his hands behind his back and continues to try to handcuff him. (*Id.* at 19:21:06-19:21:12.) Plaintiff continues to cry out. (*Id.*) One of the officers asks Plaintiff, "Are you done?" (*Id.* at 19:21:23.) Lane tells Plaintiff, "Put your hands behind your back, I'm going to give it again." (*Id.*at 19:21:21.) Plaintiff says, "Okay, okay," and then, "Look." (*Id.* at 19:21:23-19:21:24.) Lane tells Plaintiff, "Last time I'm going to tell you, dude." (*Id.* at 19:21:26.) Plaintiff says, "All right," and at the same time, Lane tases Plaintiff in his leg. (*Id.* at 19:21:26-19:21:28.) Plaintiff yells out in pain and pushes the Taser away. (*Id.* at 19:21:29.) Lane puts the Taser back against Plaintiff's leg, removes the Taser briefly, and then applies the Taser again. (*Id.* at 19:21:29-19:21:45.)

Lane and Chavez stand Plaintiff up, and Plaintiff yells, "Stop!" and "[unintelligible] is on fire!" (*Id.* at 19:22:01.) Lane pushes Plaintiff down to the pavement, and Chavez says, "I got his hand" as he handcuffs Plaintiff's left hand. (*Id.* at 19:22:09.) Chavez's body-worn camera is blocked for the next two minutes. (*Id.* at 19:22:14-19:24:06.) Plaintiff is heard saying, "All right, I am not resisting." (*Id.* at 19:23:17.) The officers tell Plaintiff, "Stop fighting." (*Id.*) One of the officers says in response to a radio call, "Negative, we're still fighting with him in the street." (*Id.* at 19:24:11.)

Plaintiff's left arm is handcuffed, and Chavez is pushing Plaintiff's left arm down. (*Id.* at 19:25:01.) One of the officers says, "We can sit here forever, dude." (*Id.* at 19:25:43.) Sirens are heard as TPD officers arrive. (*Id.* at 19:26:24.)

**E.    City of South Tucson's Use of Force Policy**

The City of South Tucson's use of force policy identifies six types of resistance:

psychological intimidation, verbal non-compliance, passive resistance, defensive resistance, active aggression, and aggravated active aggression. (Doc. 173-1 at 9-10.)

The policy defines verbal non-compliance as verbal responses indicating the subject's unwillingness to comply with direction and may include verbal threats made by the subject. (*Id.* at 9.) Passive resistance includes "physical actions that do not directly prevent the officer's attempt at control" and that do not "attempt to defeat the physical actions of the officer." (*Id.*) The policy states that passive resistance is usually in the form of a relaxed or "dead weight" posture intended to make the officer lift, push, or pull the subject to establish control. (*Id.*) Defensive resistance "includes physical actions, other than solely running prior to physical contact, that attempt to prevent the officer's control, but do not involve direct attempts to assault the officer." (*Id.* at 9-10.) Defensive resistance includes attempting to push or pull away "in a manner that does not allow the officer to establish control." (*Id.* at 10.)

The policy defines active aggression as "behavior that is a physical assault on the officer or another, where the offender prepares to strike, strikes, or uses other physical techniques in a manner that may result in injury to the officer." (*Id.*) Aggravated active aggression includes a physical assault on the officer or another person in a manner that creates a substantial risk of causing serious physical injury or death. (*Id.*)

The policy states that "hard control techniques," which "may cause physical injury," are "usually applied when lesser forms of control have failed or are not applicable because the suspect's initial resistance is at a heightened level." (*Id.* at 11.) "Generally, these techniques are used to control active aggression, although [they] may be used in some situations when facing defensive resistance." (*Id.*) Hard control techniques include "closed fist strikes, hammer fist strikes, palm strikes, elbow strikes, knee strikes and kicks." (*Id.*) "Officers shall target large muscle groups with strikes and kicks" and hard control techniques "should not be intentionally used on the suspect's head, neck, kidneys, groin, joints, spine, or sternum." (*Id.*)

The policy states a "take down is the forceful direction of the suspect to the ground"

and is generally used to "counter defensive resistance or active aggression." (*Id.*) Non-deadly weapons, such as Tasers and chemical agents, "provide a method of controlling subjects when deadly force is not justified." (*Id.* at 11.) Non-deadly weapons "are generally used when empty hand control techniques are either not sufficient or not tactically the best option for the safety of the officer, the suspect, and/or others," but "they can be used whenever reasonable to do so." (*Id.*) As relevant here, the policy states that OC spray is "generally used when reasonably necessary to subdue a person who is threatening or attempting physical harm to himself or others[ or] resisting or interfering with an arrest." (*Id.* at 11-12.) OC spray may be used against a subject who is using, at a minimum, defensive resistance. (*Id.* at 12.) The policy states, "Unless the subject refuses and if available, flush the face with water and/or apply a wet towel to the face. Do not leave the subject unattended. Keep the subject in a freestanding or upright position." (*Id.*)

The policy states that a Taser may be deployed "when reasonable against a subject engaging in acts of active aggression or aggravated active aggression, or to prevent a person from harming him/herself." (*Id.*) "Absent an on-going threat to officer safety, the primary objective is to approach the suspect and restrain him/her so that the suspect can be taken into custody safety." (*Id.*) The policy states that the Taser may be activated and displayed as a visual deterrent when a subject is displaying defensive resistance or higher levels of force. (*Id.*) "When circumstances permit, the officer shall advise the subject that, if the subject's disruptive behavior does not cease," the Taser will be used. (*Id.*) The Taser is deployed by two methods: drive stun, which involves contact with the suspect, and probe deployment, which involves firing the cartridge from a distance. (*Id.* at 15.)

**III.   Defendants' Argument Regarding Plaintiff's Statement of Facts**

As an initial matter, the Court addresses Defendants' argument that Plaintiff's statement of facts does not comply with Rules 7.2 and 56.1(b) of the Local Rules of Civil Procedure. (Doc. 169 at 3.) Defendants contend that "[i]t is not sufficient to simply say a fact is disputed or object to a fact by calling it irrelevant. Plaintiff is required to point to the specific admissible portion of the record disputing the fact." (*Id.* at 4.) Defendants

assert that Local Rule 56.1 "does not permit explanation and argument supporting the party's position to be included in the. . . statement of facts." (*Id.*) Defendants ask the Court to accept each of their stated facts as undisputed. (*Id.*)

Under Local Rule 56.1(b), a party opposing a motion for summary judgment must file a statement, "separate from that party's memorandum of law, setting forth: (1) for each paragraph of the moving party's separate statement of facts, a correspondingly numbered paragraph indicating whether the party disputes the statement of fact set forth in that paragraph and a reference to the specific admissible portion of the record supporting the party's position if the fact is disputed; and (2) any additional facts that establish a genuine issue of material fact or otherwise preclude judgment in favor of the moving party." LRCiv 56.1(b). "Each additional fact must be set forth in a separately numbered paragraph and must refer to a specific admissible portion of the record where the fact finds support." *Id.*

Plaintiff's Statement of Facts does not comply with Local Rule 56.1(b) because it does not contain, for each paragraph of Defendants' Statement of Facts, a correspondingly numbered paragraph indicating whether Plaintiff disputes the statement of fact set forth in that paragraph and a reference to the specific admissible portion of the record supporting his position if the fact is disputed. Plaintiff's "Conflicting" Statement of Facts includes citations to the record; to the extent that those citations do not support Plaintiff's facts, as Defendants assert, the Court has only considered any properly supported facts that are relevant to the merits of Plaintiff's claims.

## IV.    Excessive Force

### A.    Legal Standards

A claim that law enforcement officers used excessive force in the course of an arrest is analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). This inquiry requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests." *Id.* To determine whether a Fourth Amendment violation has occurred, the court conducts a three-step analysis assessing (1) the nature of

force inflicted; (2) the governmental interests at stake, which involve factors such as the severity of the crime, the threat posed by the suspect, and whether the suspect is resisting arrest (the "*Graham* factors"); and (3) whether the force used was necessary. *Espinosa v. City & County of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396–97, and *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003)). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

At the summary judgment stage, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the question of whether an officer's actions were objectively reasonable under the Fourth Amendment is a "pure question of law." *Scott*, 550 U.S. 372, 381 n.8 (2007). But an officer is not entitled to summary judgment if the evidence, viewed in the nonmovant's favor, could support a finding of excessive force. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc). Because the excessive force balancing test is "inherently fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Green v. City and County of S.F.*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks omitted); *see Smith*, 394 F.3d at 701 (excessive force cases often turn on credibility determinations, and the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom") (quotation omitted).

. . . .

. . . .

### B.    Parties' Arguments

#### 1.    Defendants' Motion

In their Motion, Defendants do not address the nature and quantum of force used. Instead, Defendants focus on the *Graham* factors.  With respect to the severity of the crime at issue, Defendants argue that "[a]t the time they were dispatched," they "believed they were dealing with armed suspects who had taken hostages for drug money," and after the initial 911 call, but before they arrived on the scene, a second 911 call was made "listing the same address." (Doc. 161 at 10.)  Defendants contend that during the second 911 call, the caller reported that a Hispanic man had broken down the door with a piece of rebar and choked a woman, and when they arrived on the scene, Rebecca Samaniego told Defendants that Plaintiff choked her daughter. (*Id.*)  Defendants assert this is aggravated assault and "arguably attempted murder." (*Id.*)

With respect to whether Plaintiff posed an immediate threat to the safety of the officers or others, Defendants argue that Plaintiff was "combative" and use of force "was the only way to gain control of" him.  (*Id.*)   Defendants assert that Plaintiff ignored Defendants Lane and Chavez's commands and was "one step away from oncoming traffic" when Defendant Lane discharged her taser. (*Id.*)  Defendants further contend that Plaintiff "fought with" Defendants Lane and Chavez; Chavez discharged pepper spray in Plaintiff's face which "had no effect"; Plaintiff punched Lane; Lane "managed to take [Plaintiff] to the ground"; Plaintiff grabbed the taser; Lane "wrestled it away and holstered it"; and Plaintiff "tried to get up again." (*Id.* at 10-11.)

Defendants further argue that Plaintiff "resisted from start to finish."  (*Id.* at 11.) They assert that Plaintiff "engaged in active, aggressive physical resistance in response to the officers' attempts to handcuff him" and "fought the officers for approximately seven minutes." (*Id.*)

#### 2.    Plaintiff's Response

In response, Plaintiff first contends that Defendants Lane and Chavez lacked probable cause and reasonable suspicion to believe that Plaintiff had committed any crime

when they initiated force against him.  (Doc. 172 at 7.)  Plaintiff asserts that where there is no probable cause that a person committed any crime, any use of force is unreasonable under the Fourth Amendment.  (*Id.*)

With respect to whether there was a Fourth Amendment violation, Plaintiff argues the incident should be analyzed in four phases.  (Doc. 172 at 9.)  Plaintiff asserts that in the first phase, Defendants "were not faced with any 'rapidly evolving situation' until [Defendant] Chavez precipitously drew his weapon."  (*Id.*)  Plaintiff contends that when the first phase commenced, Defendants lacked probable cause to believe that Plaintiff had committed a crime and had only "reasonable suspicion that any[ ]one of the many persons Defendants claim were milling around might have engaged in domestic violence."  (*Id.*)  Plaintiff argues that when Defendant Lane arrived, "there was no reasonable suspicion that the claimed hostage situation in the first call even existed."  (*Id.* at 12.)  Plaintiff contends that Defendant Lane's "casual approach and conversation with the unidentified man belie any proposition of an exigent, life-or death situation."  (*Id.*)  Plaintiff asserts the situation Defendant Chavez confronted when he arrived at the scene "was completely under control."  (*Id.*)

Plaintiff characterizes the second phase as the "second unprovoked tasing and chemical spray."  (*Id.* at 19.)  Plaintiff asserts that "Defendants do not even attempt to point to any objective fact from which they could claim that Plaintiff presented any immediate threat."  (*Id.*)  Plaintiff contends that Defendant Chavez "[did] not testify as to any objective facts that [Plaintiff] was an immediate threat to him or Lane, nor that he was actively resisting."  (*Id.* at 20.)

Plaintiff describes the third phase as "multiple uses of force"; specifically, Defendant Lane's use of the taser and "left hook" to Plaintiff's head.  (*Id.*)  Plaintiff asserts that Defendant Lane successfully fired both cartridges and then discharged the weapon another five times in stun-drive mode for a total of forty seconds within one minute.  (*Id.* at 21.)  Plaintiff concedes that he "did engage in defensive resistance" but asserts "this resistance was reasonable, being entirely triggered by the Defendants' excessive force in

the First and Second Phases." (*Id.*)

Finally, Plaintiff characterizes the fourth phase as the "continuing infliction of force." (*Id.* at 23.)  Plaintiff asserts that during the 31-minute body worn camera footage, although "EMTs arrive at some point, and the police and the EMTs work over [Plaintiff], he is never placed in an upright position, nor is he given any first aid[] for the exposure to the chemical OC spray, nor is he untrussed." (*Id.*)  According to Plaintiff, "these failures violated Policy" and amounted to "continuation of the use of force." (*Id.*)

### 3.    Defendants' Reply

In their Reply,[3] Defendants object to Plaintiff's characterization of the incident unfolding in four, separate phases. (Doc. 169 at 2.)  Defendants argue that Plaintiff "use[s] a few selective moments" and "disregard[s] his ongoing fight against the officers in the middle of the street." (*Id.*)  Defendants also contend that "[i]t is relevant and admissible that Plaintiff had a long history of posing a threat to others including law enforcement." (*Id.* at 3.)  Defendants argue that Plaintiff's version of events conflicts with the grand jury testimony incorporated into his plea agreement, and this Court "previously recognized that [Plaintiff] cannot now dispute the facts incorporated in his guilty plea." (*Id.* at 9.)

### C.    Fourth Amendment Analysis

### 1.    Relevance of Plaintiff's Plea

Defendants argue that although Plaintiff now "claims he was the victim" in the October 2019 incident, he is "bound by his plea and admissions and cannot contest the factual basis as outlined in the Grand Jury Indictment." (Doc. 161 at 3.)  Defendants assert that the Court "previously held [that Plaintiff] cannot now contest the factual basis of his plea agreement." (*Id.* at 9.)[4]  Thus, according to Defendants, Plaintiff cannot claim that he

---

[3] Defendants use their Reply, in part, as a de facto response to Plaintiff's Conflicting Statement of Facts.  Rule 56.1 of the Local Rules of Civil Procedure explicitly prohibits reply statements of fact.  LRCiv 56.1(b).  The Court therefore will not consider Defendants' responses to Plaintiff's statements of fact.

[4] Defendants cite the Court's June 11, 2025 Order denying Plaintiff's Motion for Reconsideration of his Motion for Leave to Amend to add a malicious prosecution claim.

"never resisted."  (*Id.*)[5]

Under *Heck v. Humphrey,* 512 U.S. 477, (1994), a section 1983 action is barred if success in the action would "necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement." *Id.* at 486.  The Court must consider "whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated."  *Id.* at 487.  By contrast, if "the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed." *Id.*  "To decide whether success on a section 1983 claim would necessarily imply the invalidity of a conviction, [the Court] must determine which acts formed the basis for the conviction." *Lemos v. County of Sonoma*, 40 F.4th 1002, 1006 (9th Cir. 2022).  When the conviction is

(Doc. 150.)  In that Order, the Court did *not* hold that cannot now contest the factual basis of his plea agreement.  In discussing a potential claim for malicious prosecution, the Court determined that leave to amend would be futile because Plaintiff could not show that his criminal prosecution terminated in his favor. (*Id.* at 10-11.)  The Court rejected Plaintiff's argument that the Court could not consider his plea agreement because it was not alleged in his amended complaint, noting that the Court may consider matters that may be judicially noticed to determine whether Plaintiff's motion to amend is futile and can take judicial notice of documents on file in federal or state courts. (*Id.* at 11.)  The Court explicitly stated, "Even accepting Plaintiff's argument that the Court cannot take judicial notice of the plea agreement for the truth of the facts recited therein, but for the existence, the Court need only consider the existence of the plea agreement to determine that Plaintiff's motion to amend . . . would be futile." (*Id.* at 12) (internal citation and quotation marks omitted).

[5] To the extent that Defendants intend to assert collateral estoppel, the Ninth Circuit has held that for collateral estoppel purposes, police officers in a subsequent federal civil action are not in privity with the prosecution in a prior state criminal action because the city policy officers were not "directly employed by the state," and the officers "had no measure of control whatsoever over the criminal proceeding and no direct individual personal interest in its outcome." *Davis v. Eide*, 439 F.2d 1077, 1078 (9th Cir. 1971).  The Ninth Circuit concluded "there was no privity sufficient to invoke the doctrine of collateral estoppel." *Id.* at 1078; *see also Tuttelman v. City of San Jose*, 420 F. App'x 758, 759 (9th Cir. 2011) (discussing *Davis*, 439 F.2d at 1078); *Hroscikoski v. City of Glendale*, 146 F. App'x 94, 96 (9th Cir. 2005) (stating that officer defendants were not in privity with the District Attorney during the plaintiff's prosecution for trespassing, and thus were not estopped from relitigating the issue of probable cause) (citing *Davis*, 439 F.2d at 1078).

based on a guilty plea, the Court looks at the record "to see which acts formed the basis for the plea." *Id.*

Plaintiff pleaded guilty to criminal damage by recklessly defacing or damaging property of another person. (Doc. 161-5 at 1.) Success on Plaintiff's excessive force claim would not necessarily imply or demonstrate that his conviction was invalid. Indeed, the crime Plaintiff committed—damaging the door of Reina's apartment—was complete by the time Defendants Lane and Chavez arrived at the scene. Even if a plaintiff has been convicted of resisting arrest, success on an excessive force claim does not necessarily imply the invalidity of the conviction if the conviction and the excessive force claim "are based on different actions during one continuous transaction." *Hooper v. County of San Diego* 629 F.3d 1127, 1134 (9th Cir. 2011); *see Kyles v. Baker*, 72 F. Supp. 3d 1021, 1035-36 (N.D. Cal. 2014). The factual basis of Plaintiff's plea is therefore irrelevant to his excessive force claim.

### 2.      Probable Cause/Reasonable Suspicion

Plaintiff contends there was no probable cause to believe he committed a crime and "only reasonable suspicion that anyone of the many persons Defendants claim were milling around might have engaged in domestic violence – there was admittedly no reasonable suspicion that any person was hold[ing] hostages as reported in the first call." (Doc. 172 at 9.) The second 911 caller reported that Hispanic male wearing a grey shirt and Levis had just choked her daughter. Plaintiff matched the description of the subject of the 911 call, and Rebecca Samaniego identified him as the person who had choked her daughter. In these circumstances, there was probable cause to arrest Plaintiff. "Fourth Amendment jurisprudence has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. But the degree of force used to effect the arrest must be objectively reasonable. *See id.* at 395. Accordingly, the existence of probable cause to arrest Plaintiff does not necessarily make Defendants Chavez and Lane's subsequent use of force reasonable under the Fourth Amendment.

### 3.    Discrete Uses of Force

Contrary to Defendants' arguments, it is appropriate for the Court to separately consider whether each use of force was reasonable under the circumstances. Defendants do not dispute that each use of force occurred. Even if an initial use of force is justified, force can become excessive if a suspect no longer poses an immediate threat to safety after the initial use of force. *See Motley v. Parks*, 432 F.3d 1072, 1088 (9th Cir. 2005), *overruled in part on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012) ("The use of a force against a person who is helpless or has been subdued is constitutionally prohibited."). And "even where some force is justified, the amount actually used may be excessive." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).

The Supreme Court's decision in *Barnes v. Felix*, 605 U.S. 73 (2025), does not mandate that the Court consider the incident as one extended use of force, rather than consider whether each use of force was reasonable in the circumstances. In *Barnes*, the Supreme Court considered whether, in resolving Fourth Amendment excessive-force claims, courts may apply a moment-of-threat rule, under which the reasonableness "inquiry is confined to whether the officer[ ]" was "in danger at the moment of the threat that resulted in [his] use of deadly force, and "[a]ny prior events leading up to the shooting, including actions the officer took, were simply not relevant." *Id.* at 78 (internal quotation marks and citation omitted). The Supreme Court held that courts may not apply a "moment-of-threat rule" because it "constricts the proper inquiry into the 'totality of the circumstances.'" *Id.* at 79. The Supreme Court recognized that "the situation at the precise time of the [use of force] will often be what matters most; it is, after all, the officer's choice in that moment that is under review," but stated that "earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *Id.* at 80. "Prior events may show, for example, why a reasonable officer would have perceived otherwise ambiguous conduct of a suspect as threatening. Or instead they may show why such an officer would have perceived the same conduct as innocuous." *Id.* "The history of the interaction, as well as other past circumstances known to the officer, thus

may inform the reasonableness of the use of force." *Id.* at 80-81.

Generally, in a deadly force case like *Barnes*, a singular use of force—the use of force that resulted in a death—is the subject of the reasonableness inquiry. *Barnes* simply reiterates the Supreme Court's longstanding "instruction to analyze the totality of the circumstances." *Id.* at 81. *Barnes* does not forbid this Court from considering the reasonableness of distinct uses of force.

### 4. Initial Encounter

#### a. Nature and Type of Force

The first use of force occurred when Defendant Chavez arrived at the scene while Defendant Lane was speaking with Plaintiff in the parking lot, and Chavez pointed his gun at Plaintiff's head. Generally, "quantifying a particular use of force requires consideration of the 'specific factual circumstances' surrounding the event." *Seidner v. de Vries*, 39 F.4th 591, 597 (9th Cir. 2022) (quoting *Lowry v. City of San Diego*, 858 F.3d 1248, 1259 (9th Cir. 2017) (en banc)). Both "[t]he nature and degree of physical contact and the risk of harm and the actual harm experienced are relevant." *Id.* (quoting *Williamson v. City of Nat'l City*, 23 F.4th 1146, 1151 (9th Cir. 2022)) (internal quotation marks omitted). The Ninth Circuit has observed that "[p]ointing a loaded gun at a suspect, employing the threat of deadly force, is use of a high level of force." *Espinosa*, 598 F.3d at 537.

#### b. *Graham* Factors

As noted, the Court considers the character of the offense of which Plaintiff was suspected of committing when Defendants were dispatched to the scene. *See Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001). An officer's use of force is evaluated in light of the crime that he was investigating. *Gabriel v. County of Sonoma*, 725 F. Supp. 3d 1062, 1073 (N.D. Cal. 2024) (citing *Rice v. Morehouse*, 989 F.3d 1112, 1123 (9th Cir. 2021)). The Ninth Circuit has "applied [the severity of crime] factor in two slightly different ways." *Nehad v. Browder*, 929 F.3d 1125, 1136 (9th Cir. 2019). First, the Ninth Circuit has concluded that "a particular use of force would be more reasonable, all other things being equal, when applied against a felony suspect than when applied against a

person suspected of only a misdemeanor." *Id.* Second, courts "use[ ] the severity of the crime at issue as a proxy for the danger a suspect poses at the time force is applied." *Id.*

Defendants argue that they initiated an expedited response to the first 911 call regarding a hostage situation "because of the immediate threat of harm." (Doc. 161 at 4.) While Defendants Lane and Chavez were en route, they received the second call reporting a domestic violence incident, in which Plaintiff allegedly assaulted his girlfriend. Assault in a domestic violence incident is a serious crime. However, when Defendant Lane arrived, Plaintiff had left the apartment and walked into the parking lot. Defendant Lane was calmly speaking to Plaintiff when Defendant Chavez arrived at the scene and immediately pointed his weapon at Plaintiff. Defendant Chavez had no reason to believe there was an ongoing hostage situation; rather, at that point, it would have been clear to a reasonable officer that Plaintiff was the subject of the second call reporting a domestic violence incident, and that the domestic violence incident was over.[6] In similar circumstances, the Ninth Circuit has found that a domestic violence offense did not justify the use of physical force. *Smith*, 394 F.3d at 703. In *Smith*, the Ninth Circuit denied qualified immunity to officers who used pepper spray and a dog to subdue and arrest a suspect who had allegedly abused his spouse. 394 F.3d at 702-03. The Ninth Circuit determined that a husband's criminal abuse of his spouse "provide[d] little, if any, basis for the officers' use of physical force" because when law enforcement "arrived [the husband] was standing on his porch alone and separated from his wife." *Id.* at 703. The first *Graham* factor weighs slightly in Plaintiff's favor.

With respect to whether Plaintiff posed an immediate threat to the safety of the officers and whether he resisted arrest, it is undisputed that Defendant Chavez pointed his weapon at Plaintiff immediately upon arriving at the scene, before he could assess whether Plaintiff posed an immediate threat to the safety of the officers or others present. On the

---

[6] Defendants allude to Plaintiff's "history of drug use, violence, and a pattern of fighting with law enforcement" (Doc. 161 at 2), but they concede they learned of Plaintiff's alleged history after the October 2019 incident and were unaware of it when the incident occurred. Plaintiff's criminal history therefore has no relevance to the excessive force inquiry on summary judgment.

other hand, the 911 dispatcher reported that Plaintiff had a tool "on him" and had broken down a door, and that the 911 caller had stated Plaintiff was "loony" and on drugs. The second *Graham* factor does not weigh strongly in favor of either Plaintiff or Defendnats. The resisting factor of the *Graham* analysis is inapplicable to Defendant Chavez's initial use of force.

### c.    Totality of the Circumstances

"Determining whether the force used to effect a particular seizure is 'reasonable'" requires balancing of the individual's Fourth Amendment interests against the relevant government interests." *County of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017) (citation omitted). "The operative question in excessive force cases is 'whether the totality of the circumstances justifie[s] a particular sort of search or seizure.'" *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). This determination is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396–97.

It is undisputed that Chavez did not give Plaintiff any orders before he pointed his weapon at Plaintiff. On this record, given the information Defendant Chavez had from the 911 dispatcher about Plaintiff and the suspected domestic violence offense, a reasonable jury could conclude that Defendant Chavez pointing his weapon at Plaintiff head was unreasonable in the circumstances.

### 5.    First Use of Taser

The next use of force was Defendant Lane's first deployment of the Taser. Viewing the evidence in the light most favorable to Plaintiff, when he heard conflicting commands from Defendants Lane and Chavez, Plaintiff pulled up his shirt rotated 360 degrees so they could see he was not armed. Plaintiff "unknowingly took a few steps toward 29th Street" when Lane deployed the taser without warning.

### a.    Nature and Type of Force

The Ninth Circuit has recognized that a taser in drive-stun can be "extremely painful." *Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) (en banc) (a taser used in

drive-stun mode "delivers an electric shock to the victim, but it does not cause an override of the victim's central nervous system as it does in dart-mode"); *Marquez v. City of Phoenix*, 693 F.3d 1167, 1171 (9th Cir. 2012), *as amended on denial of reh'g* (Oct. 4, 2012) ("'Drive-stun mode' . . . encourages the suspect to comply by causing pain"); *Kaady v. City of Sandy*, No. CV. 06–1269–PK, 2008 WL 5111101, at *16 (D. Or. Nov. 26, 2008) ("While the Taser does not typically cause any lasting injury or pain, being shocked by a Taser is a painful experience.").

### b.    *Graham* Factors

To the extent that Plaintiff taking a few steps away from Defendants Lane and Chavez can be construed as resistance, it is passive resistance.  The Ninth Circuit has "long distinguished between passive and active resistance." *Rice*, 989 F.3d at 1123.  Resistance "should not be understood as a binary state, with resistance being either completely passive or active.  Rather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer." *Bryan*, 630 F.3d at 830. "[T]he level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." *Id.*  "[P]urely passive resistance can support the use of some force, but the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." *Id.*  A "failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force." *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012).

The Court considers the City of South Tucson's use of force policy.  *See Glenn v. Washington County*, 673 F.3d 864, 875 (9th Cir. 2011).  That policy states that Tasers should only be used when a subject is engaging in active aggression or aggravated active aggression.  Walking away from Defendants Chavez and Lane was, at most, passive resistance under the use of force policy.  Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that walking away from Chavez and Lane did not warrant the application of the "non-trivial amount of force" by the Taser.  *See Gravelet-*

*Blondin v. Shelton*, 728 F.3d 1086, 1093-94 (9th Cir. 2013) (denying qualified immunity where plaintiff did not respond to officers' orders and officers tased him in "dart mode").

### c.       Totality of the Circumstances

The Ninth Circuit has recognized that "police officers normally provide [] warnings where feasible, even when the force is less than deadly, and that the failure to give such a warning is a factor to consider." *Bryan*, 630 F.3d at 830 (citing *Deorle*, 272 F.3d at 1284). It is undisputed that Defendant Lane did not warn Plaintiff before he deployed the Taser the first time.  On this record, a reasonable jury could conclude that Defendant Lane's initial use of the Taser was unreasonable in the circumstances.

### 6.       Second Use of Taser and Pepper Spray

After the first Taser deployment, Plaintiff collapsed on the pavement.  Plaintiff was lying on his back, awaiting handcuffing, when he "felt his face and eyes on fire." Defendant Lane discharged a second Taser cartridge into Plaintiff, and at the same moment, Defendant Chavez pulled and discharged OC spray into Plaintiff's face.

### a.       Nature and Type of Force Used

As noted, the use of a Taser in stun mode is a non-trivial use of force. *Mattos*, 661 F.3d at 443.  The Ninth Circuit has found that the use of OC or pepper spray constitutes "intermediate force" because, although non-lethal, it is designed to cause intense pain and is constitutes "a significant intrusion." *Young v. County of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011).

### b.       *Graham* Factors

When Plaintiff jumped up from the pavement and began running, Defendants Lane and Chavez could reasonably believe that Plaintiff was trying to resist arrest or escape. Plaintiff's subjective thought process is irrelevant.  However, even under the City of South Tucson's use of force policy, Plaintiff's resistance remained more passive than active. Plaintiff was not engaging in active aggression or aggravated active aggression under the policy, which was required for Lane's use of the Taser, because Plaintiff did not "prepare[] to strike, strike[], or uses other physical techniques in a manner that may result in injury to

the officer" or physically assault the officers.  The use of force policy states that OC spray may be used against subjects who are using, at a minimum defensive resistance.  Defensive resistance "includes physical actions, other than solely running prior to physical contact, that attempt to prevent the officer's control, but do not involve direct attempts to assault the officer."  The video evidence shows that when Defendant Chavez sprayed the OC spray, Lane and Chavez had not made physical contact with Plaintiff; thus, Plaintiff was "solely running prior to physical contact" and was not using defensive resistance.

The Court may also consider whether the officers' "precipitate actions in making the arrest could reasonably be considered 'provocative.'" *Blankenhorn*, 485 F.3d at 479. In *Blankenhorn*, arresting officers gave the plaintiff no warning that they were going to arrest him before gang-tackling him and later applying hobble restraints.  *Id.*  Video evidence showed that officers did not even attempt to handcuff the plaintiff before they simultaneously took hold of and wrestled him to the ground.  *Id.*  The Ninth Circuit concluded that "[t]he lack of forewarning, the swiftness, and the violence with which the defendant officers threw themselves upon [the plaintiff] could reasonably be considered 'provocative,' triggering [the plaintiff's] limited right to reasonable resistance." *Id.* at 479-80.

Here, Plaintiff jumped up and began running after the first Taser deployment; he did not "str[ike] out at any of the officers." *Id.* at 480.  "Considering the rapidity of the officers' actions and the restrained nature of [Plaintiff's] own response, a jury could conclude [Plaintiff's] resistance was reasonable under the circumstances." *Id.*

### c.    Totality of the Circumstances

On this record, a reasonable jury could conclude that deploying the Taser a second time and pepper-spraying Plaintiff was unreasonable under the circumstances.  *See id.*; *Young*, 655 F.3d at 1168 (denying qualified immunity where officer used pepper spray and baton to subdue a plaintiff who had disobeyed orders and backed away from officer); *Gravelet-Blondin*, 728 at 1093-94.

**7.    Third Use of Taser, Take-Down, Punches and Kicks, and Pinning**

After Defendant Lane deployed the Taser for the second time and Defendant Chavez sprayed the pepper-spray, Plaintiff leapt up and tried to flee. Defendant Lane pursued Plaintiff, pressing his Taser into Plaintiff's back in drive-stun mode. Holding Plaintiff from behind, Lane took Plaintiff down to the pavement. Lane and Chavez delivered punches and kicks to Plaintiff's body. With the weight of the two officers on top of him, Plaintiff was unable to get a breath, and before the TPD officers arrived, he twice blurted out, "I can't breathe!"

**a.    Nature and Type of Force**

Defendant Lane's fist strikes were capable of inflicting pain and causing serious injury. *See Coles v. Eagle*, 704 F.3d 624, 628 (9th Cir. 2012) (kicking and baton blows to the plaintiff before he was handcuffed involved "intermediate force" that presented "a significant intrusion"); *Nelson*, 685 F.3d at 878 ("We have recognized that 'physical blows or cuts' often constitute a more substantial application of force than categories of force that do not involve a physical impact to the body."); *Bryan*, 630 F.3d at 826.

Defendant Lane's use of his body weight on Plaintiff was also significant force. *Scott v. Smith*, 109 F.4th 1215, 1223 (9th Cir. 2024) (holding that the use of bodyweight compression for one or two minutes on a suspect who is becoming breathless is the use of "severe, deadly force"; *see Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003) (noting that plaintiff alleged that two officers pressed their weight on his neck and torso as he lay handcuffed on the ground and begged for air and that under similar circumstances, in what has come to be known as "compression asphyxia," prone and handcuffed individuals in an agitated state have suffocated under the weight of restraining officers).

**b.    *Graham* Factors**

Plaintiff concedes that he "did engage in defensive resistance" but asserts "this resistance was reasonable, being entirely triggered by the Defendants' excessive force in the First and Second Phases." (*Id.*) Plaintiff swung his left hand at Defendant Lane and

struck Lane's body.  (*Id.*)  This amounted to active resistance.  But even active resistance does not necessarily justify the quantum of force used.  *See Glenn*, 673 F.3d at 875; *Blankenhorn*, 485 F.3d at 480 ("Although Blankenhorn initially resisted being arrested, Nguyen's punches were not necessarily a reasonable response.").  Furthermore, the Ninth Circuit has recognized that "officers themselves may 'unnecessarily creat[e] [their] own sense of urgency.'"  *Nehad*, 929 F.3d at 1135 (quoting *Torres v. City of Madera*, 648 F.3d 1119, 1127 (9th Cir. 2011); *see also Porter v. Osborn*, 546 F.3d 1131, 1141 (9th Cir. 2008) ("When an officer creates the very emergency he then resorts to deadly force to resolve, he is not simply responding to a preexisting situation.").  "Reasonable triers of fact can, taking the totality of the circumstances into account, conclude that an officer's poor judgment or lack of preparedness caused him or her to act unreasonably, 'with undue haste.'"  *Nehad*, 929 F.3d at 1135 (quoting *Torres*, 648 F.3d at 1126).

Here, a reasonable jury could conclude that if Defendants Lane and Chavez had not used unreasonable force in the first place, Plaintiff would not have resisted, and there would have been no need to use force at all.

### c.      Totality of the Circumstances

On this record, a reasonable jury could conclude the Defendant Lane deploying the Taser for a third time, striking Plaintiff with his fist, and pinning him down with his body weight, where Defendants Lane and Chavez's unnecessary use of force precipitated the subsequent need for force, was unreasonable.

### 8.      Leaving Plaintiff Restrained for 31 Minutes

Plaintiff characterizes the final phase of Defendants Lane and Chavez's use of force as "dump[ing] [him] on the side of the street," "trussed up in the Ripp-Hobble, on his side, without anyone removing the hobbles, getting him upright, or providing first aid for the chemical spray."  (PCSOF ¶ 82.)  Plaintiff argues that "[t]his continuation of the use of force, in violation of department policy and in the face of the obvious distressed condition of the victim of the Defendants' repeated assaults . . . requires a jury to decide if this intentional conduct is itself an excessive use of force."  (Doc. 172 at 23.)  Defendants

contend "there is no evidence [Plaintiff] was ever 'hog-tied,' 'trussed up,' or that the TARP was improperly applied," and "[t]here was no reason to believe, based on his prior continued efforts, that if released from the restraints [Plaintiff] would not continue resisting and attempting to escape." (Doc. 169 at 18.)

With respect to the use of hobble restraints after taking a person into custody, the Court must "balance competing concerns." *Blankenhorn*, 485 F.3d at 479. "On the one hand, the Fourth Amendment permits police officers to use some force to overcome resistance to being arrested." *Id.* (citing *Graham*, 490 U.S. at 396). Thus, "the need to maintain control of a person who physically struggled while being taken into custody might reasonably call for the use of hobble restraints." *Id.* "On the other hand, a person has the 'limited right to offer reasonable resistance to an arrest that is the product of an officer's personal frolic. That right is not triggered by the absence of probable cause, but rather by the officer's bad faith or provocative conduct." *Id.* (quoting *United States v. Span*, 970 F.2d 573, 580 (9th Cir. 1992)). Where a reasonable jury could conclude that an arrestee's resistance was reasonable under the circumstances, arresting officers are not entitled to summary judgment on a claim that the use of hobble restraints was excessive under the circumstances. *See id.* at 480.

For the reasons discussed above, on this record, a reasonable jury could conclude that the use of hobble restraints was excessive under the circumstances.

The remainder of this claim is more properly analyzed as a failure to provide objectively reasonable post-arrest care than excessive force. *See Neuroth v. Mendocino County*, No. 15-cv-03226-RS, 2018 WL 4181957, at *7 (N.D. Cal. Aug. 31, 2018). Law enforcement officers are required under the Fourth Amendment to provide objectively reasonable post-arrest care. *See Borges v. County of Eureka*, No. 15-cv-00846-YGR, 2017 WL 363212, at *6 (N.D. Cal. Jan. 25, 2017). "While the nature and extent of this obligation has not been precisely defined, the Ninth Circuit requires, at a minimum, that officers summon necessary medical help or take an injured arrestee to a hospital." *Neuroth*, 2018 WL 4181957, at *7 (citing *Borges*, 2017 WL 363212, at *6) (in turn citing *Estate of*

*Cornejo ex rel. Solis v. City of Los Angeles*, 618 F. App'x 917, 920 (9th Cir. 2015) and *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006)).

Defendants do not dispute that Plaintiff was left restrained for more than 30 minutes after he was pepper-sprayed. Although Defendants argue that his prior resistance warranted the continued use of hobble restraint, as discussed, a reasonable jury could conclude that Defendants' conduct precipitated Plaintiff's resistance and could reasonably infer that if force was not used, Plaintiff would not resist. On this record, a reasonable jury could conclude that Defendants Lane and Chavez failed to provide objectively reasonable post-arrest care.

### 9. Conclusion

On this record, there are genuine disputes of material fact regarding whether Defendants Lane and Chavez violated Plaintiff's Fourth Amendment rights. The Court will therefore consider whether Lane and Chavez are entitled to qualified immunity.

### D. Qualified Immunity

#### 1. Legal Standard

Under the doctrine of qualified immunity, state officials are not liable under § 1983 "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *Dist. of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Qualified immunity "attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 78-79 (2017)). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Moore v. Garnand*, 83 F.4th 743, 750 (9th Cir. 2023) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). In other words, the "clearly established" inquiry asks whether the officer had "fair notice" that he acted unconstitutionally. *Brosseau v. Haugen*, 543 U.S. 194, 198

(2004).  This standard "protects all but the plainly incompetent or those who knowingly violate the law."  *al-Kidd*, 563 U.S. at 743.  Plaintiff has the burden of showing that the right was clearly established at the time of the alleged misconduct.  *Kisela*, 584 U.S. at 104.

"Because the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct."  *Id.* (quoting *Brosseau*, 543 U.S. at 198).  "Although 'a case directly on point' is not necessarily required, a rule is only clearly established if it has been 'settled' by 'controlling authority' or 'a robust consensus of cases of persuasive authority' that 'clearly prohibit[s] the officer's conduct in the particular circumstances,' with 'a high degree of specificity.'"  *Hopson v. Alexander*, 71 F.4th 692, 697 (9th Cir. 2023) (quoting *Wesby*, 583 U.S. at 63-64).

At summary judgment, an officer may be denied qualified immunity "only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood [his] conduct to be unlawful in that situation."  *Torres*, 648 F.3d at 1123.

### 2.    Parties' Arguments

Defendants argue they are entitled to qualified immunity because "there is no 'clearly established' right not to be seized or tased when 1) suspected of aggravated assault and walking away from officers toward the street and vehicular traffic while 2) disobeying direct officer orders."  (Doc. 161 at 13.)  Defendants also contend there is no "clearly established" right to be free from "officers using the physical force necessary to counter a suspect like [Plaintiff], who was fighting, fleeing, and punched an officer."  (*Id.*)  Defendants assert that an officer "may use a taser to stop and subdue a non-compliant, fleeing felony suspect who did not have a weapon and did not pose an immediate risk of harm."  (*Id.*)  Defendants argue that Defendants Lane and Chavez "expected a hostage situation because of drugs" and "knew that someone had been choked," and when they arrived at the scene, Plaintiff "walked toward the street and disobeyed their commands to

stop." (*Id.*)  Defendants contend that a reasonable officer in Defendants' positions "would not have understood, beyond debate, that using a taser to control a non-compliant [Plaintiff] and prevent him from going into the street, would constitute excessive force." (*Id.* at 14.) Defendants further assert that "[a]fter the first tasing, the officers faced active, aggressive resistance" when Plaintiff "dislodged the taser leads, ran into the street and punched [Defendant] Lane," and "[a] reasonable officer would not have understood, beyond debate, that using physical force to overcome this active resistance would constitute excessive force." (*Id.*)

In response, Plaintiff argues that the Court must deny qualified immunity because "[t]he record reveals genuine issues of material fact in all of the Phases of the incident." (Doc. 172 at 8.)

### 3.    Analysis

In his Response, Plaintiff points to *Blankenhorn*, 485 F.3d at 481; *Furnace v. Sullivan*, 705 F.3d 1021 (9th Cir. 2013); *Hyde v. City of Willcox*, 23 F.4th 863 (9th Cir. 2022); and *Mullins v. Cyranek*, 805 F.3d 760 (6th Cir. 2015), as holding that Defendants Lane and Chavez's actions "violated clearly established law." (Doc. 172 at 8.)  *Furnace* is inapposite because it involved an alleged use of excessive force under the Eighth Amendment.  705 F.3d at 1027-28.  *Hyde* is inapplicable because it involved an alleged use of excessive force under the Fourteenth Amendment, and, in any event, it post-dated the October 2019 incident and therefore could not have put Defendants Chavez and Lane on notice as to the unlawfulness of their actions.  23 F.4th at 869.  *Mullins* is not binding on this Court and is distinguishable on its facts because it involved the use of deadly force. 805 F.3d at 765-66.

In *Blankenhorn*, an officer stopped the plaintiff at a shopping mall because the plaintiff had previously received a Notice Forbidding Trespass.  *Id.* at 468.  At some point, an officer grabbed his arm and, when the plaintiff pulled free, the officer threatened to spray him with mace.  *Id.* at 478.  When the officer asked him to kneel down so he could be handcuffed, the plaintiff refused.  *Id.*  Almost immediately, three officers "gang-tackled"

the plaintiff, one officer punched the plaintiff several times, and an officer or officers pushed his face into the pavement by shoving a knee into the back of his neck. *Id.* Once the plaintiff was subdued, the officers placed hobble restraints on his ankles, which made it difficult for him to move and breathe. *Id.*

The Ninth Circuit concluded that under *Graham*, "force is only justified when there is a need for force," and "this clear principle would have put a prudent officer on notice that gang-tackling without first attempting a less violent means of arresting a relatively calm trespass suspect—especially one who had been cooperative in the past and was at the moment not actively resisting arrest—was a violation of that person's Fourth Amendment rights." 485 F.3d at 481. "This same principle would also adequately put a reasonable officer on notice that punching [the plaintiff] to free his arms when, in fact, he was not manipulating his arms in an attempt to avoid being handcuffed, was also a Fourth Amendment violation." *Id.*

Defendants mischaracterize the right at issue by framing it in terms of their version of events. The right at issue is the right to be free from significant uses of force where a person is suspected of a domestic violence offense that was no longer in progress, is unarmed, and poses no threat to the safety of officers or others. *See City of Escondido v. Emmons*, 586 U.S. 38, 43 (2019) (per curiam) (in qualified immunity analysis, a court should ask whether clearly established law prohibited the officers from using a particular use of force in these circumstances). This right has long been clearly established, even where a suspect engages in passive resistance. *See A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005 (9th Cir. 2016) (stating that "domestic disputes do not necessarily justify the use of even intermediate . . . force").

In *Smith*, the husband "continually ignored" officer commands to remove his hands from his pockets and to not re-enter his home. 394 F.3d at 703. The husband also "physically resisted . . . for only a brief time." *Id.* The Ninth Circuit concluded that although the husband was not perfectly passive in the encounter, it did not appear that his resistance "was particularly bellicose" and thus found that this factor provided little support

for a use of significant force.  *Id.*

In *Mattos*, the Ninth Circuit recognized domestic disturbances as a "'specific factor [ ]' relevant to the totality of the[ ] circumstances" in a Fourth Amendment analysis.  661 F.3d at 450.  The Ninth Circuit observed that "[d]omestic violence situations are particularly dangerous because more officers are killed or injured on domestic violence calls than on any other type of call."  *George v. Morris*, 736 F.3d 829, 839 (9th Cir. 2013) (quoting *Mattos*, 661 F.3d at 450) (internal quotation marks omitted)).  At the same time, "the legitimate escalation of an officer's concern[ ] about his or her safety is less salient when the domestic dispute is seemingly over by the time the officers begin their investigation."  *Id.* (quoting *Mattos*, 661 F.3d at 450.)  The Ninth Circuit in *George* denied qualified immunity partly because the victim of the domestic disturbance "was unscathed and not in jeopardy when deputies arrived."  *Id.*

Here, as in *Smith*, *Mattos*, and *George*, any domestic violence had ended by the time Defendants Lane and Chavez arrived at the scene, and Plaintiff was separated from Reina.  Ninth Circuit precedent gave Lane and Chavez "fair notice" that the nature of the 911 call itself did not justify the use of significant force.

As discussed, Plaintiff's passive resistance does not change the qualified immunity analysis.  It was clearly established before October 2019 that use of intermediate force, such as a Taser in drive-stun mode, is an unreasonable response to passive or minor resistance."  *See Gravelet-Blondin*, 728 F.3d at 1093-94; *Bryan*, 630 F.3d at 822, 830 (interpreting behavior as "passive" or "minor" resistance rather than "truly active resistance" where plaintiff, after being pulled over for a seatbelt infraction and ordered to stay in the car, exited his car, acted belligerent, and ignored repeated orders to get back in the car); *Mattos*, 661 F.3d at 443, 445 (plaintiff refused to comply with officer orders, physically resisted officers' attempts to remove her from the car by keeping her hands on the steering wheel, physically blocked officer access to the suspect, her husband, and put her hands on an officer when he tried to pass by her to arrest her husband); *Deorle*, 272 F.3d at 1276-77 (plaintiff brandishing a hatchet and a crossbow, verbally abusing officers,

and "continually roaming about his property despite officers' orders" was not "sufficient active resistance to warrant use of the beanbag shotgun").

Where factual disputes exist, summary judgment is appropriate only if a defendant is entitled to qualified immunity on the facts as alleged by the non-moving party. *See Green*, 751 F.3d at 1052 ("While [qualified immunity is] generally a question of law to be determined by the court, there are disputed material facts here that prevent [the court] from making such a finding at this juncture."); *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003) ("Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate"). Accepting Plaintiff's facts as true, Defendants Chavez and Lane are not entitled to qualified immunity.

For the foregoing reasons, the Court will deny Defendants' Motion for Summary Judgment as to Count One.

## V.   Ratification

In Count Two of the FAC, Plaintiff asserts a ratification claim against the City of South Tucson.  (FAC ¶¶ 33-43.)

### A.   Allegations

Plaintiff alleges that he was "still at the scene of the incident, and following his transport to the hospital for assessment and treatment, Defendants Lane and Chavez met with, and conferred with STPD Sergeant Sean Masters, who took command of the scene." (*Id.* ¶ 37.)  Plaintiff claims "Defendants Lane and Chavez conveyed the true facts of the assaults to Masters, aware that their actions had violated Plaintiff's right to freedom from unreasonable searches and seizures, and their use of excessive force, and the three police officers reached agreement to conceal the true facts." (*Id.* ¶ 38.)  Plaintiff asserts that both Lane and Chavez subsequently, "and with the knowledge and approval of Masters, documented false narratives of the events in order to conceal their violations of law." (*Id.* ¶ 39.)  Plaintiff alleges that the Chief of Police "knew of the true facts of the events of the night of October 12, 2019, knew that the two officers had brutalized Plaintiff, had violated

Department policy on use of excessive force, [and] knew that the actions constituted a violation of Plaintiff's right to privacy and bodily integrity." (FAC ¶ 40.) Plaintiff contends the "actions of the Chief of Police and department heads before October 19, 2019, communicated to STPD Sergeant Masters that his actions in concealing the extra-constitutional use of excessive force, including fabricating or directing the fabrication reports, communication logs and other records, and the spoliation of evidence, were accepted and expected of supervision." (*Id.* ¶ 41.) Plaintiff asserts that "[t]he actions of the Chief of Police, his department heads and Sergeant Masters in facilitating the fabrication of evidence constituted ratification of the unconstitutional use of force and itself constituted ratification of the judicial deception." (*Id.* ¶ 42.)

## B. Defendants' Arguments

In their Motion, Defendants argue that "[t]here is no evidence of falsified documents, nor any evidence that the City has a practice or custom of falsifying or destroying documents." (Doc. 161 at 16.) Defendants contend that in his criminal case, Plaintiff "capitalized on the so-called video (the video had been redacted by Pima County; [Plaintiff] claimed because STPD could not produce the original video, it must have been altered)." (*Id.*) Defendants note that during this litigation, the unredacted video was later found in the Pima County Attorney's file and in STPD archives, and there was no manipulation of any video. (*Id.*) Defendants assert there is no evidence that anyone with policy-making authority ratified the actions of any City officers by "facilitating the fabrication of evidence." (*Id.* at 16-17.)

## C. Analysis

In his Response, Plaintiff does not address Defendants' arguments regarding the ratification claim.

Local government entities are considered "persons" who may be sued under § 1983. *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690 (1978). However, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom,

whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694; *see also Long v. County of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006) ("A municipality may not be sued under § 1983 solely because an injury was inflicted by one of its employees or agents."). Thus, "to establish liability for governmental entities under *Monell*, a plaintiff must show (1) the plaintiff possessed a constitutional right of which []he was deprived; (2) the municipality had a policy; (3) the policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) the policy is the moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citation omitted).

The Ninth Circuit has found *Monell* liability "on the basis of ratification when the officials involved adopted and expressly approved of the acts of others who caused the constitutional violation." *Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996). Ratification "generally requires more than acquiescence." *Sheehan v. City and County of S.F.*, 743 F.3d 1211, 1231 (9th Cir. 2014).

Plaintiff has presented no evidence that any official adopted and expressly approved of Defendants Chavez and Lane's acts. By failing to respond to Defendants' arguments, Plaintiff has failed to establish a genuine dispute of material fact with respect to his ratification claim. The Court will therefore grant Defendants' Motion for Summary Judgment as to Count Two.

## VI.    Discovery Motions

### A.    Defendants' Motion to Compel

In their Motion to Compel, Defendants ask the Court to compel Plaintiff to produce "full and adequate responses" to Defendants' first set of Requests for Production, first and second sets of Non-Uniform Interrogatories and amended second set of Requests for Admission. (Doc. 153 at 1-2.) Defendants contend that Plaintiff's Responses "offer legally and factually invalid objections." (*Id.* at 1-2.) Defendants requested that Plaintiff produce correspondence between Plaintiff and Plaintiff's counsel with Reina Samaniego. (*Id.* at 4.)

In their first set of non-uniform interrogatories, Defendants asked Plaintiff to "use the video from Officer Chavez's body cam to identify each instance that Plaintiff alleges Officer Lane 'discharged his Taser on the body of Steven Saenz, identifying the mode used,' and each time Officer Chavez 'discharged his OC spray onto Steven Saenz.'" (*Id.* at 7.)  In their second set of non-unform interrogatories, Defendants asked Plaintiff to provide a specific factual basis for Plaintiff's denials of Defendants Requests for Admission ## 1-3. (*Id.* at 8.)  In their amended second set of Requests for Admission, Defendants asked Plaintiff to "state in detail the grounds for your denial, objection, inability or refusal to admit" any of the Requests.  (*Id.* at 9.)

In his Response to Defendants' Motion to Compel, Plaintiff argues that Defendants served their discovery requests on May 20, 2025, which did not allow him sufficient time to respond to the requests before the close of discovery on June 6, 2025.  (Doc. 156 at 6.) Plaintiff asserts that he objected to the untimeliness of the requests but "fully and completely responded even after the deadline, on June 16, 2025." (*Id.*)  Plaintiff also points out that although Defendants' counsel certified that he had engaged in personal consultation and sincere efforts to resolve the discovery dispute, counsel's "claim is based entirely on an exchange of emails between the undersigned and a paralegal, and, as to that, only as to one matter among the multitude concerning which he now seeks to compel discovery." (*Id.* at 7.)  Plaintiff's counsel certifies that "except for the single question raised by the paralegal, the claimed deficiencies have *never* been brought to his attention until the Motion was filed." (*Id.*)  Plaintiff further contends that Defendants have failed to establish that any response was not compliance with the discovery rules.  (*Id.*)

Under Rule 37(a)(3)(B), "A party seeking discovery may move for an order compelling an answer, designation, production, or inspection" if "a party fails to answer an interrogatory submitted under Rule 33." Fed. R. Civ. P. 37(a)(3)(B)(iii).  With respect to requests for admission, "A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter." Fed. R. Civ. P. 36(a)(3).  Rule 36(a) is self-executing

and the failure to timely respond to requests for admissions results in automatic admission of the matters requested. *F.T.C. v. Medicor LLC.*, 217 F. Supp. 2d 1048, 1053 (C.D. Cal. 2002) (citation omitted).

The Court's January 30, 2024 Scheduling Order states, "Interrogatories must be submitted sufficiently in advance to permit the opposing party to answer before the discovery deadline, thereby giving the party submitting the interrogatories sufficient time to undertake discovery made necessary by the answer." (Doc. 21.)  In a February 24, 2025 Order, the Court set the deadline for completion of all discovery as June 6, 2025.  (Doc. 104.)   As Plaintiff points out, Defendants served their Second Set of Requests for Admission, First Set of Non-Uniform Interrogatories, and Second Set of Non-Uniform Interrogatories on Plaintiff on May 20 and 21, 2025.  (*See* Docs. 140, 141, 143.)  Under Rule 33(b)(2), "[t]he responding party must serve its answers and any objections within 30 days after being served with the interrogatories."  Fed R. Civ. P. 33(b)(2).  Defendants therefore did not comply with the Court's Order requiring interrogatories to be submitted sufficiently in advance to permit the opposing party to answer before the discovery deadline.  Plaintiff was not required under Rule 33(b)(2) to file objections to the interrogatories before the prescribed 30 days elapsed merely because Defendants disregarded the Scheduling Order.  Likewise, Plaintiff was not required to submit responses to Defendants' requests for admission before the deadline for discovery passed, and Plaintiff did not fail to timely respond to requests for admissions.

In their Reply to Plaintiff's Response, Defendants argue that any untimeliness of the discovery requests should be excused because "[t]here is no prejudice to Plaintiff, who to some degree at least, provided responses"; many of the requests "mirror" requests sent to Defendants; and the discovery requests "relate to issues that arose based on discovery and responses that were served close to the end of the discovery period."  (Doc. 158 at 8.)

As noted, the Court issued the original Scheduling Order on January 30, 2024, and twice extended the deadline for completion of discovery.  (Docs. 61, 104.)  Defendants served their First Set of Requests for Admission on Plaintiff on April 2, 2025.  (*See* Doc.

115.) Under Rule 36(a)(3), Plaintiff had 30 days to serve his responses to the Requests for Admission. Fed. R. Civ. P. 36(a)(3). Plaintiff timely served his Responses to Defendant City of South Tucson's First Set of Requests for Admission on May 2, 2025, more than one month before the close of discovery. (*See* Doc. 134.) Defendants could have, but did not, move to determine the sufficiency of Plaintiff's answers or objections. *See* Fed. R. Civ. P. 36(a)(6) ("The requesting party may move to determine the sufficiency of an answer or objection. Unless the court finds an objection justified, it must order that an answer be served. On finding that an answer does not comply with this rule, the court may order either that the matter is admitted or that an amended answer be served."). Furthermore, Rule 36 provides, "A party may serve on any other party a written request to admit, for purposes of the pending action only, the truth of any matters within the scope of Rule 26(b)(1) relating to: (A) facts, the application of law to fact, or opinions about either; and (B) the genuineness of any described documents." Defendants' second set of Requests for Admission—which asked Plaintiff to "state in detail the grounds for your denial, objection, inability or refusal to admit" any of the Requests—were not proper requests for admission under Rule 36. Defendants' choice to use interrogatories and additional requests for admission to determine the basis for Plaintiff's answers and objections to its initial discovery requests is not a basis for the Court to excuse Defendants' failure to comply with the Federal Rules of Civil Procedure, the Local Rules of Civil Procedure, and the Court's Orders.

For the foregoing reasons, the Court will deny Defendants' Motion to Compel Discovery.

### B. Plaintiff's Cross-Motion for Attorney's Fees and Sanctions

Plaintiff asks the Court to order Defendants to pay the expenses and attorney's fees he incurred in responding to Defendants' Motion to Compel. Rule 37(a)(5)(B) of the Federal Rules of Civil Procedure provides that if a motion to compel discovery is denied, the court may require movant, the attorney filing the motion, to pay the party who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's

fees. Fed. R. Civ. P. 37(a)(5)(B). "But the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust." (*Id.*) The Court finds that an award of expenses would be unjust in these circumstances and will therefore deny Plaintiff's Cross-Motion in this respect.

Plaintiff also requests sanctions against Defendants and their counsel for their violation of Rule 26(g) of the Federal Rules of Civil Procedure and Rule 7.2(j) of the Local Rules of Civil Procedure. (*Id.* at 13-15.) The Court declines to impose sanctions. The Court will therefore deny Plaintiff's Cross-Motion insofar as it seeks sanctions against Defendants and their counsel.

### C.     Plaintiff's Motion to Quash

In his Motion to Quash, Plaintiff asks the Court to quash a subpoena duces tecum that directs the City of Peoria to produce employment records of Plaintiff's expert, Lon Bartel. (Doc. 155 at 1.) Plaintiff asserts that he received the subpoena by United States mail "well after June 11, 2025," after the deadline for completion of discovery. (*Id.*) Plaintiff also contends the Defendants were required to serve a notice of intent to issue a copy of the subpoena before serving the subpoena, which Defendants failed to do. (*Id.* at 2.) Defendants did not file a response to the Motion.

Because the Motion is unopposed, the Court will grant the Motion and quash the subpoena.

**IT IS ORDERED**:

(1)     Defendants' Motion for Summary Judgment (Doc. 161) is **granted** in part and **denied** in part. The Motion is **granted** as to Count Two and the City of South Tucson. The Motion is **denied** as to Count One and Defendants Chavez and Lane.

(2)     The City of South Tucson and Count Two are **dismissed with prejudice**.

(3)     Defendants' First Motion to Compel Discovery (Doc. 153) is **denied**.

(4)     Plaintiff's Motion to Quash Subpoena Duces Tecum (Doc. 155) is **granted**. The Subpoena Duces Tecum served on the City of Peoria is **quashed**.

(5)    Plaintiff's Cross-Motion for Award of Fees and Costs and Sanctions (Doc. 156) is **denied**.

Dated this 20th day of March, 2026.

Honorable James A. Soto
United States District Judge

- 41 -